UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN BRITTON, Individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>POLESTAR AUTOMOTIVE HOLDING UK PLC; THOMAS INGENLATH; JOHAN MALMQVIST; and PER ANSGAR,<br><br>    Defendants. | Case No: 25-cv-00840-CCC-JBC<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

NATURE OF THE ACTION ............................................................................1

PARTIES..........................................................................................................5

FACTUAL CHRONOLOGY RELATED TO POLESTAR, ITS SPAC TRANSACTION THAT LED TO A $25 MILLION SETTLEMENT FOR THE SPAC'S PRE-MERGER SHAREHOLDERS, AND THE ADMITTED ACCOUNTING FAILURES THAT HAVE DAMAGED ITS POST-MERGER SHAREHOLDERS .................................................................................................8

    1.   Polestar Secures a Public Listing By Merging with a Blank Check Company ..................................................................................................................8

    2.   The Merger Leads to a $25 Million Class Action Settlement for Breach of Fiduciary Duty ........................................................................................11

    3.   Post-Merger, Polestar's Internal Controls are Woefully Deficient ...............12

    4.   At the Same Time, Polestar's Ramp Up Falters As its Balance Sheet Deteriorates and it Struggles to Stretch its Limited Capital ..........................19

    5.   Defendants Repeatedly Certify the Financial Statements Based on the Deficient Processes ................................................................................25

    6.   The Internal Control Weaknesses that Polestar was Aware of Cause Polestar to Restate its Financials ...............................................................27

    7.   Additional Detail on Defendants' Admitted Accounting Errors....................32

      a.   The Relevant Accounting Rule ...................................................34

      b.   Materiality of Accounting Errors in Financial Statements .........................37

    8.   Numerous Red Flags Demonstrate that Defendants' Accounting Errors Were Reckless at Best ...........................................................................39

      a.   The Direct Overlap Between the Control Weaknesses and the Restatement..............................................................................39

i

b.    The 2021 Unique Tooling Agreement with Geely ....................................40

c.    The Earlier Restatement.............................................................41

d.    The 2023 Tooling-Related Asset Transfer Agreement..............................41

e.    Polestar's Evolving Disclosures...................................................42

f.    Production Delays .................................................................43

g.    The Scale, Scope and Centrality of the Error ....................................44

DEFENDANTS' FALSE AND MISLEADING STATEMENTS .........................45

ADDITIONAL SCIENTER ALLEGATIONS.............................................53

LOSS CAUSATION..................................................................54

PLAINTIFFS' CLASS ACTION ALLEGATIONS ....................................56

COUNT I..........................................................................59

    Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All
    Defendants .....................................................................59

COUNT II ........................................................................62

    Violations of Section 20(a) of the Exchange Act Against the Individual
    Defendants .....................................................................62

PRAYER FOR RELIEF ..............................................................63

JURY TRIAL DEMANDED ............................................................64

ii

Co-Lead Plaintiffs Mohamed Soliman and Timothy Bluto ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, a review of the Defendants' public documents, and announcements made by Defendants, public filings, wire and press releases published by and regarding Polestar Automotive Holding UK PLC f/k/a Gores Guggenheim, Inc. ("Polestar"), and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of all persons or entities who purchased the publicly traded securities of Polestar between June 24, 2022 and January 16, 2025, both dates inclusive (the "Class Period").[1] Plaintiffs

---

[1] Excluded from the Class are: (a) persons or entities who suffered no compensable losses; (b) Defendants; the present and former officers and directors of Polestar at all relevant times; members of such excluded persons' immediate families and their legal representatives, heirs, successors, or assigns; and (c) any entity that any person excluded under subsection (b) controlled or has or had a material ownership interest at any time.

pursue claims against Polestar, its former Chief Executive Officer Thomas Ingenlath, its former Chief Financial Officer John Malmqvist, and its former Chief Financial Officer Per Ansgar (collectively, "Defendants"), under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and SEC Rule 10b-5 promulgated thereunder.

2.     This case is about a fledgling electric vehicle ("EV") company that entered the public markets before it had the financial-reporting infrastructure necessary to meet its obligations as a public issuer.

3.     Beginning less than a week after going public through a SPAC merger, Polestar repeatedly disclosed serious weaknesses in its internal control over financial reporting that the Company failed to remediate. Despite these known deficiencies, Defendants continued to issue and certify Polestar's financial statements, representing that the Company's financial statements fairly presented Polestar's financial condition and that the reported balance sheets accurately reflected the Company's assets and obligations. These certifications were not only false but reckless; the product of ignoring glaring red flags warning of the precise risks that materialized.

4.     Polestar's January 16, 2025 Restatement Announcement revealed a major accounting failure in the way Polestar reported the capital commitments required to manufacture its vehicles as Polestar struggled to ramp up production of

2

its EV fleet. Polestar admitted that it had improperly waited to recognize certain unique tooling assets until a late production-linked milestone – either a production-standard-part process test or the start of production – even though the relevant contractual terms required the Company to recognize these unique tooling assets as assets under construction (or "AUC") as work progressed. As a result, Polestar underreported both the production-related assets it was building and the liabilities it had incurred to build them, painting a misleading picture that understated the capital-intensiveness of Polestar's production ramp.

5.      Defendants would have discovered this error had they not recklessly disregarded the very issues they told investors they were focusing on. By its own account, Polestar was focused – even "freakishly" so – on the capital intensity of its production ramp, its working-capital discipline, cash-flow management, accrued expenses, and the financial burden of launching Polestar 3 and Polestar 4 into the market. The accounting error that the Restatement revealed sat at the center of all of these issues. While imperceptible to investors, the accounting error was obvious, or at least readily discoverable, to Polestar based on information uniquely available to Polestar and central to the issues Defendants claimed to be monitoring.

6.      Accordingly, the Restatement was not a surprise accounting technicality but a foreseeable result of Defendants' decision to certify financial statements while ignoring glaring red flags in the exact area they claimed to be

3

focused on. Defendants knew Polestar's internal controls were deficient, knew the Company had made prior accounting errors in similar circumstances, knew its production ramp depended on capital-intensive unique tooling, and knew investors were focused on working capital, cash burn, and the cost of bringing new vehicles into production. Had Defendants exercised even ordinary care in reviewing these issues and certifying Polestar's financials, they would have discovered that Polestar was understating assets under construction and accrued liabilities and therefore downplaying the capital outflows that Polestar's daunting production ramp would require. Defendants' failure to do so was reckless at best.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder by the SEC.

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

4

10.    In connection with the acts, transactions, and conduct alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

11.    Co-Lead Plaintiff Mohamed Soliman purchased Polestar securities at artificially inflated prices during the Class Period, as set forth in the previously filed Certification (Dkt. No. 9-5), and suffered damages as a result of the conduct alleged herein.

12.    Co-Lead Plaintiff Timothy Bluto purchased Polestar securities at artificially inflated prices during the Class Period, as set forth in the previously filed Certification (Dkt. No. 11-4), and suffered damages as a result of the conduct alleged herein

13.    Defendant Polestar (or "Company") purports to be "the Swedish electric performance car brand with a focus on uncompromised design and innovation, and the ambition to accelerate the change towards a sustainable future."

14.    The Company is incorporated in England and Wales and has its principal place of business in Gothenburg, Sweden. Polestar Automotive USA Inc. is located at 777 MacArthur Blvd., Mahwah, NJ 07430.

5

15.     Polestar's Class A American Depositary Shares ("ADS" or "ADSs") trade on the NASDAQ exchange under the ticker symbol "PSNY."

16.     Polestar became a publicly traded company by virtue of a merger (the "Merger") with a blank check company, or special purpose acquisition company ("SPAC"), Gores Guggenheim, Inc. ("GGI"). Polestar's ADSs crashed as the Company belatedly revealed what Defendants had known or should have known but recklessly disregarded in the period leading up to the January 2025 Restatement Announcement—its woeful internal controls necessitated a sprawling financial restatement stretching back years at the same time that its anemic production ramp required the Company to "reset" its finances and issue updated financial targets.

17.     Defendant Thomas Ingenlath served as the Company's Chief Executive Officer ("CEO") from the beginning of the Class Period until October 1, 2024.

18.     Defendant Johan Malmqvist served as the Company's Chief Financial Officer ("CFO") from the beginning of the Class Period until January 11, 2024.

19.     Defendant Per Ansgar served as the Company's CFO from January 2024 until October 2024.

20.     Defendants Ingenlath, Malmqvist, and Ansgar are collectively referred to herein as the "Individual Defendants."

21.     Each of the Individual Defendants:

6

(a)   directly participated in the management of the Company;

(b)   was directly involved in the day-to-day operations of the Company at the highest levels;

(c)   was privy to confidential proprietary information concerning the Company and its business and operations;

(d)   was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)   was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)   approved or ratified these statements in violation of the federal securities laws.

22.   The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

7

**FACTUAL CHRONOLOGY RELATED TO POLESTAR, ITS SPAC TRANSACTION THAT LED TO A $25 MILLION SETTLEMENT FOR THE SPAC'S PRE-MERGER SHAREHOLDERS, AND THE ADMITTED ACCOUNTING FAILURES THAT HAVE DAMAGED ITS POST-MERGER SHAREHOLDERS**

1. **Polestar Secures a Public Listing By Merging with a Blank Check Company**

23. Polestar is a Swedish electric car company that, after being spun off by Volvo in 2017, was searching for growth financing as it aspired to scale from a niche EV brand into a global EV manufacturer.

24. Seeking to ramp up production dramatically, Polestar had a strong need to access the public capital markets as its business strategy required heavy near-term investment in new models, unique tooling, production capacity, and geographic expansion.

25. GGI was a SPAC or a blank-check company that was set up in early in 2021.

26. A SPAC is a publicly traded company that has no commercial operations. Instead, a SPAC is formed for the purpose of raising capital through an initial public offering that the SPAC uses to fund a merger with an existing company within a specified period of time.

27. A potential merger with GGI offered Polestar the intriguing possibility of an immediate $1 billion capital injection, as well as a NASDAQ listing at a major valuation.

28.    Polestar and GGI quickly agreed to a Merger, with the two sides hastily executing a term sheet on June 23, 2021 and publicly announcing the Merger on September 27, 2021. But closing the deal required a vote of the SPAC's stockholders.

29.    Accordingly, on May 25, 2022, GGI and Polestar announced that a registration statement on Form F-4 was effective with respect to the proposed business combination between GGI and Polestar and, the same day, the Final Proxy Statement/Prospectus was filed with the SEC containing the information on which the SPAC stockholders were to vote on the Merger at a special meeting the following month.

30.    The Final Proxy Statement/Prospectus contained a host of material financial analyses, including financial projections.

31.    The Final Proxy Statement/Prospectus made clear that these metrics relied on the internally prepared projections for the fiscal years ending in December 31, 2021, though December 31, 2025, that Polestar had provided to GGI in connection with GGI's consideration of the Merger.

32.    Polestar had provided these metrics to GGI back in September of 2021.

33.    As 2021 wound to a close, however, it was becoming increasingly clear that the massive slowdown from the COVID-19 pandemic was going to have long-

9

lasting effects on Polestar's business. Due to the pandemic, China had ordered sweeping shutdowns in key areas. Polestar manufactured its vehicles in China.

34.    As a result, Polestar was forced to downgrade many of its key financial projections.

35.    Polestar provided GGI with modified financial projections in January of 2022, which was four months before the stockholder vote on the Merger.

36.    These revisions reflected material operational and financial developments, including:

- Polestar would sell only 50,000 vehicles instead of the 65,000 sales assumed in the original projections, due to the fact that Polestar makes vehicles in China and, because of the resurgence of COVID-19 in 2022, China engaged in a series of crippling lockdowns;

- Polestar would have zero revenue from carbon credits, reducing revenue by $81 million for 2022; $133 million for 2023; $233 million in 2024; and $195 million in 2025;

- Total goods sold would be reduced by $620 million for 2022;

- Gross profit would be reduced by $180 million for 2022; with further anticipated reductions in 2023, 2024, and 2025 due to the impact of changes in sales mix and reduction of carbon credits;

- Operating expenditures would increase by approximately $50 million per year 2022-2025;

- Adjusted Earnings Before Interest and Taxes ("EBIT") would be reduced by $250 million; and

- Net income would be reduced by $230 million.

10

37.    Yet despite having these revised projections months before the stockholder vote, the parties to the Merger did not renegotiate it or even make material revisions to the financial projections for the 2023, 2024 or 2025 fiscal years.

38.    Instead, the Final Proxy Statement/Prospectus contained financial projections that Defendants knew at the time were blatantly unattainable.

39.    Having been provided with a host of false and misleading financial projections in the Final Proxy Statement/Prospectus, the SPAC shareholders approved the transaction. Polestar and GGI completed the Merger on June 23, 2022.

## 2.    The Merger Leads to a $25 Million Class Action Settlement for Breach of Fiduciary Duty

40.    After the Merger, as Polestar missed every financial milestone that the Final Proxy Statement/Prospectus had projected, investors started to learn that they had been duped—the true state of Polestar's business was very different than what was described in the Final Proxy Statement/Prospectus.

41.    On August 23, 2023, after Polestar's stock price had already fallen from $10 to $4, the SPAC's shareholders filed a class action fiduciary duty lawsuit in Delaware Chancery Court. *Terry May, et al., v. Gores Guggenheim Sponsor LLC, et al.*, 2023-0863 (Del. Ch.) (the "Fiduciary Duty lawsuit").

42.    The Fiduciary Duty lawsuit alleged, *inter alia*, that the Final Proxy Statement/Prospectus contained materially false and misleading representations

11

about Polestar's value and prospects, including misleading financial projections that Polestar had prepared for the 2023, 2024 and 2025 fiscal years.

43.    After several years of litigation, the Fiduciary Duty lawsuit settled in 2026 for a payment of $25 million to GGI's stockholders as of the date of the Final Proxy Statement/Prospectus that contained the allegedly misleading representations concerning Polestar's business.

44.    The Stipulation of Settlement was dated February 20, 2026, and was signed and agreed to by both GGI and related parties, as well as Polestar. In the Settlement Agreement, plaintiffs noted, had the litigation continued, the case would entail obtaining evidence from Polestar in Sweden.

### 3.    Post-Merger, Polestar's Internal Controls are Woefully Deficient

45.    The Merger made Polestar a public company, bringing a host of accounting and financial reporting requirements that Polestar knew it was unprepared to meet from the very beginning.

46.    For instance, on June 29, 2022, less than a week after the Merger closed, Polestar filed a shell-company Form 20-F, stating:

> As a private company, Polestar has not been required to document and test its internal controls over financial reporting nor has management been required to certify the effectiveness of its internal controls and its auditors have not been required to opine on the effectiveness of its internal control over financial reporting. Polestar is subject to the internal control over financial reporting requirements established pursuant to the Sarbanes-Oxley Act and will become

12

subject to the auditor attestation requirements in the year in which it files its second annual report…

In the course of auditing the Polestar Automotive Holding Limited's financial statements as of and for the years ended December 31, 2021 and 2020, the Polestar Automotive Holding Limited and its independent registered public accounting firm identified material weaknesses in the Polestar Automotive Holding Limited's internal control over financial reporting as well as other control deficiencies…

[T]he accounting department does not have a sufficient number of personnel with SEC technical accounting expertise to perform supervisory reviews and monitor activities over financial reporting matters and controls. Remediation of this material weakness is ongoing and management has determined there is still a material weakness as of December 31, 2021.

47.    In addition to stating that Polestar had a host of accounting-related internal control deficiencies, the same filing disclosed unique tooling agreements that required that Polestar make payments prior to the start of vehicle production.

48.    In particular, the filing described a major Unique Vendor Tooling Agreement, under which Polestar had agreed to pay related-party Geely for unique vendor tooling on a monthly basis, "as the actual costs occur."

49.    This June 2022 filing made clear the Unique Vendor Tooling Agreement was aimed at the period prior to production:

In December 2021, Polestar entered into a unique vendor tooling agreement and a unique in-house tooling and equipment agreement for the PS4. These agreements were entered into as part of Polestar's and Geely's intent to enter into a more detailed agreement related to manufacturing OEM services for the PS4 ***prior to the commencement of production***. Aggregate payments

13

Polestar will make to Geely under this agreement and the amounts of future commitments are $137,382 as of December 31, 2021.

50.    The filing continued:

The Group has certain leases stemming from contract manufacturing agreements related to the production of Polestar vehicles. These agreements are associated with unique type bound tooling and equipment ("PS Unique Tools") used in the production of Polestar vehicles at certain suppliers and vendors. The PS Unique Tools are suited specifically for Polestar vehicles and Polestar has the right to direct the use of the related assets. The production of Polestar vehicles occupies 100% of these assets' capacity; as such, the PS Unique Tools are also recognised as ROU assets by the Group.

51.    Thus, less than a week after the Merger, Polestar and its auditor Deloitte had already identified internal control weaknesses in Polestar's technical accounting and financial-reporting processes, with Polestar separately disclosing unique tooling arrangements whose cost-incurrence terms would have made the later AUC/accrual issue apparent to Polestar had it conducted even a cursory accounting review.

52.    The following year, on April 14, 2023, Polestar filed its annual report on Form 20-F for 2022 (the "2022 20-F" or "2022 Annual Report"), its first annual report as a public company.

53.    In the 2022 20-F, Polestar again disclosed the 12/23/2021 Unique Vendor Tooling Agreement under which Polestar had agreed to pay related-party Geely for unique vendor tooling on a monthly basis, "as the actual costs occur."

14

54.    The 2022 20-F repeated the earlier disclosure about the PS Unique Tools, but this time added an accounting trigger tied to the start of production:

The Group has certain leases stemming from contract manufacturing agreements related to the production of Polestar vehicles. These agreements are associated with unique type bound tooling and equipment ("PS Unique Tools") used in the production of Polestar vehicles at certain suppliers and vendors. The PS Unique Tools are suited specifically for Polestar vehicles and Polestar has the right to direct the use of the related assets. The production of Polestar vehicles occupies 100% of these assets' capacity; as such, the PS Unique Tools are also recognized as ROU assets by the Group ***from the day production starts.***

55.    In addition, the 2022 20-F elaborated on the internal control problems that had been identified previously, which had not been remediated:

In connection with the audit of Polestar's financial statements as of the year ended December 31, 2022, management concluded that there were four material weaknesses in internal control over financial reporting as of December 31, 2022: (i) The controlling department does not have a sufficient number of qualified personnel connecting operations and finance and the accounting function does not have fully formalized accounting processes or a sufficient number of personnel with technical accounting and SEC regulatory reporting expertise to perform reviews of financial reporting matters and other key controls, including performing timely reviews of work performed by external advisors. This caused a failure to design and maintain an effective control environment with the appropriate associated control activities; (ii) A lack of appropriate processes and controls to recognize revenue in accordance with IFRS 15; (iii) A lack of appropriate processes and controls to properly recognize intangible assets at period end in accordance with service agreements for upcoming car models; and (iv) Insufficient processes and controls over the existence, completeness and valuation of inventory.

15

56.    While the internal control weaknesses had not been remediated, Polestar's 2022 20-F outlined an ongoing remediation plan, which included, *inter alia*, to "continue hiring additional accounting and finance resources with appropriate technical accounting and reporting experience to execute key controls related to various financial reporting processes."

57.    On June 6, 2023, Polestar released its 2022 UK Annual Report, in which it reiterated that it had major internal control weaknesses and further specified that these deficiencies related to depreciation and amortization related to tooling.

58.    On April 30, 2024, Polestar filed a Form NT 20-F, stating that it required additional time to close its books and records, complete its financial statement preparation and file its 2023 Form 20-F.

59.    Polestar's filing stated: "The additional time required to close the Company's books and records includes the evaluation and quantification of certain errors in historical 2021 and 2022 annual and interim financial statements."

60.    Polestar continued: "Additional time is also required by the Company to complete the additional work required for management's assessment of internal control over financial reporting for the year ended December 31, 2023, as this is the first year that the Company is subject to this requirement."

16

61.    On May 31, 2024, Defendant Ingenlath made a pre-recorded video statement to investors, which was subsequently filed as Exhibit No. 99.2 to the Company's Form 6-K filing on that date. Therein, Ingenlath assured the market that "we are making good progress" with respect to "certain errors in our audited 2021 and 2022 accounts."

62.    On August 14, 2024, Polestar filed its delayed 2023 annual report on Form 20-F (the "2023 20-F" or "2023 Annual Report"). The 2023 20-F stated: "In connection with the preparation of our consolidated financial statements as of and for the year ended December 31, 2023, management identified various misstatements in our previously issued 2021 and 2022 annual financial statements."

63.    This filing further explained that the prior period errors relate primarily to, inter alia, accounting for accruals and deferrals, and incorrect capitalization and/or failure to capitalize the Company's expenses.

64.    The 2023 20-F reported that the finance function still "does not have fully formalized processes nor throughout the organization sufficient number of personnel within finance and operations with the appropriate accounting and SEC regulatory reporting expertise to perform appropriate and timely reviews of financial reporting matters, the financial statements and disclosure, key controls, and work performed by external advisors related to financial reporting and technical accounting."

17

65.    The filing stated that the accounting-related material weaknesses, including the completeness and accuracy of accrued expenses and accounts payable as well as the precision in the review of certain accrued expenses, and the completeness and accuracy of related party data used in the controls and the precision of review in management review controls over related party transactions, had not been remediated.

66.    Reporting Polestar's related party transactions, the filing described the 2021 unique vendor tooling agreement this way:

> On December 23, 2021, Polestar entered into a unique vendor tooling agreement with Geely related to PS4 unique vendor tooling related to the manufacturing of the PS4. Under the agreement, Geely agreed to invest a maximum of $83,646 for PS4 unique vendor tooling on behalf of Polestar and Polestar agreed to pay Geely monthly as costs are incurred.

67.    The 2023 20-F again set forth the accounting trigger for unique tooling as the date of production, stating that "the production of Polestar vehicles occupies 100% of these assets' capacity; as such, the PS Unique Tools are also recognized as ROU assets by the Group from the day production starts."

68.    At the same time, the 2023 20-F also stated: "Polestar owns the unique tooling which is used in the manufacturing of its vehicles. Tooling is depreciated on a production basis and capitalized into inventory."

69.    In addition, Polestar's filing disclosed another related party transaction involving tooling, this one in connection with the PS3. It was an asset transfer

18

agreement, dated December 8, 2023, in which the Company agreed to sell Polestar's unique tooling to Geely and to account for it as a financing transaction. This unique tooling related to the PS3, which did not go into production until 2024.

70.    Presumably, for Polestar to sell this PS3, pre-production unique tooling to Geely in December of 2023, it had to be on the balance sheet. Yet somehow Polestar was waiting until production began to even start accounting for the PS4 unique tooling assets that Polestar claimed to have been paying Geely for monthly since December 2021, as costs were incurred.

71.    This accounting treatment makes no sense, and does not pass the smell test. It is reckless at best. More, the error would not have been detectible by an investor looking at the balance sheet, who would have assumed that Polestar's unique tooling was being accounted for as Machinery Under Development—until Polestar's January 16, 2025 Restatement Announcement disclosed that it was not being accounted for at all.

72.    Weeks later, on August 28, 2024, Defendant Ingenlath announced his resignation with the change effective October 1, 2024.

**4.    <u>At the Same Time, Polestar's Ramp Up Falters As its Balance Sheet Deteriorates and it Struggles to Stretch its Limited Capital</u>**

73.    On July 2, 2024, Polestar issued a press release reporting preliminary financial and operational results for the first quarter of 2024, along with delivery data for the second quarter.

19

74.    Polestar's press release revealed that the Company's ramp was under strain. Polestar reported only 20,200 deliveries for the first half of 2024, while telling investors that it expected a stronger second half as Polestar 3 and Polestar 4 deliveries increased.

75.    In addition, Polestar admitted that, due to the negative effects of import duties, EV-market pricing pressure, and other short-term impacts, "Polestar is adapting its business plan, including implementing additional mitigating actions, and expects to provide updated guidance later in the year."

76.    By July 2024, then, Defendants knew that Polestar's production and commercial ramp had not progressed as previously expected and that the Company's prior financial trajectory would require a reset.

77.    On the July 2, 2024 earnings call, Defendant Ansgar reiterated that the Company was facing unexpected financial headwinds in connection with its effort to ramp production, confirming in prepared remarks that "we are adapting our business plan, including additional mitigation, and we expect to provide updated guidance later this year."

78.    On that call, Defendant Ingenlath stated that "[i]t is fair to say we ended 2024 with inventory higher than we wanted or anticipated, but we took actions and have seen improvements already in the first quarters of 2024."

79.     Defendant Ingenlath further stated that "I would like to reflect on the Q2 delivery figures. Start of this year was very slow, but we took immediate action" and reported that "[w]e have strong momentum as we enter the second half of this year."

80.     In the question-and-answer part of the call, Defendant Ansgar was asked directly about Polestar's dwindling capital. Defendant Ansgar's answer acknowledged some difficulties but reaffirmed his unrelenting focus on the issue:

**Andres Sheppard [Cantor Fitzgerald]**

Got it. That's very helpful. Appreciate all the color. And maybe as a quick follow-up, one for you, Per is can you just remind us with slightly less than $800 million in liquidity, what is that -- what do the capital needs look like for this year? And how are you thinking about that in this environment? Thank you.

**Defendant Ansgar**

No. Thanks for that question. I must say that I am -- I must say I like working with cash flow. I think that is very fun. And obviously, it's very important also. So we are working very intensively with the company to improve our cash flow situation. And there is always a lot of things that can be done. And you will see going forward into the second quarter that we are working very hard with working capital and to improve our cash flow situation.

…

Clearly then with the situation right now where we see movements in tariffs and movements in price position, et cetera. There will be a lot of focus for us to adapt our business plan and our projects going forward, as Thomas said, on mitigating the activities and so on, and we will come back later this year

21

on more specific things on how we look at our needs going forward here, if there are any changes to that or not.

What is important to say also is that earlier this year, our ultimate owner Geely Holding has also expressed strong support to our business. So we're in constant dialogue with both them and Volvo Cars and others just to let them know our funding position. So I'm very confident around all these things here.

81.    On August 29, 2024, Polestar released its earnings and financial results for the second quarter of 2024, which continued to show major financial hurdles in Polestar's ramp.

82.    On the second quarter earnings call held the same day, much of the discussion revolved around the speed at which Polestar was burning through cash. Responding to analyst questions on Polestar's burn rate, Defendant Ansgar explained that the company's outflows on investment and production were high but expressed his hope that they were peaking, and reaffirmed the Company's focus and commitment on keeping working capital as lean as possible:

**Defendant Ansgar**

Of course, the underlying cash burn is driven -- two things right now. It's the gross margin that you see has been basically breakeven gross margin in the last couple of quarters here. We will, going forward, have a positive gross margin with the Polestar 3 and Polestar 4s. And on top of that one, of course, our investing cash flow is, I would expect this year to be kind of like a peak year. And when we are putting all the money into Polestar 3, Polestar 4 and the last R&D expenditure into Polestar 5. So, when we go into next year, our investing cash flow will go down as well.

22

So, combination of keeping working capital as lean as possible, getting gross margin up and gradually reducing our investment levels will give us a better cash flow going forward. And you will see that gradually coming especially into next year.

**Daniel Röska [Bernstein Research]**

Great. That was super helpful. Thanks, Per.

83.    In addition, Defendant Ansgar continued to hold himself out as responsible for and – freakishly – focused on Polestar's cash flows: "Like I said on the last call, I am a bit of a freak. I like working with cash flow. I think this is very fun and obviously, it's very important. I firmly believe that there are a lot of things that can be done on this front."

84.    Later, he added for emphasis: "If I start with our cash flow, and I probably portrayed myself now as a cash flow freako, as I said that, but we worked hard with our cash flow, making sure that we work with our working capital. So, we have had an -- as you see, on our first half of this year, our cash burn is significantly lower than the same period last year. So, we've done a lot of good improvements there."

85.    On September 4, 2024, Barclays issued an analyst report digesting Polestar's rocky financial results, entitled: "*2Q earnings review – challenges remain as PSNY works to find its footing with PS3 and PS4.*" The report stated: "More broadly, we would expect the new PSNY [management] team to review and

23

perhaps issue updated financial targets," as Barclays acknowledged that Polestar investors faced "the need for a reset."

86.    In October 2024, Michael Lohscheller was appointed as President and CEO, effective from October 2024; Jean-Francois Mady appointed as Chief Financial Officer, effective from October 2024; and Jonas Engström appointed as Chief Operating Officer, effective December 2024.

87.    On October 11, 2024, Reuters reported that the new CEO and CFO would address the potential "reset" as follows:

> Polestar recently went through a major reshuffle where it replaced its CEO, head of design, chair of the board and appointed a new CFO.

> Polestar said it expects revenue for the full year to remain stagnant owing to the difficult market conditions and the import duties. In 2023, the company recorded revenue of $2.38 billion.

> New CEO Michael Lohscheller, in his first public statement since taking over on October 1, announced a strategic review to "set out a clear path for Polestar's development", with an update on January 16 along with its third-quarter financials.

88.    Two months later, Polestar provided the "reset" in the form of updated financial targets, reduced guidance, and an accounting restatement telling investors that the previous several years of financial results should not be relied upon.

24

**5.    Defendants Repeatedly Certify the Financial Statements Based on the Deficient Processes**

89.    Despite Polestar's unreadiness to be a public company and woefully deficient financial controls, Defendants continued to certify the financial statements and attest to their accuracy.

90.    For instance, Item 18 of Polestar's 2022 20-F contained the Company's financial statements for the year ended December 31, 2022, including Polestar's Consolidated Statement of Loss and Comprehensive Loss, Consolidated Statement of Financial Position, Consolidated Statement of Changes in Equity, Consolidated Statement of Cash Flows, and Notes to the Consolidated Financial Statements.

91.    Further, Item 19 of the 2022 20-F contained signed certifications pursuant to the Sarbanes-Oxley Act.

92.    In the Section 302 certifications, Defendants Ingenlath and Malmqvist certified that they had reviewed the 2022 Form 20-F and that based on their knowledge it did not contain any untrue statement of material fact or omit material facts necessary to make the statements not misleading, and that the financial statements fairly presented, in all material respects, Polestar's financial condition, results of operations, and cash flows.

93.    The certifications also represented that Defendants Ingenlath and Malmqvist were responsible for establishing and maintaining Polestar's internal controls.

25

94.     In the Section 906 certifications, Defendants Ingenlath and Malmqvist certified that the 20-F complied with all Exchange Act requirements and that the information contained in the report fairly presented, in all material respects, Polestar's financial condition and results of operations.

95.     Defendants made the aforementioned certifications despite acknowledging that the Company's disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting.

96.     The Company's 2023 20-F, filed on August 14, 2024, contained financial statements for the year ended December 31, 2023, including the Company's Consolidated Statement of Financial Position, Notes to the Consolidated Financial Statements, and Consolidated Statement of Cash Flows.

97.     Defendants Ingenlath and Ansgar signed certifications pursuant to Section 302, certifying that based on their knowledge the 2023 20-F did not contain material misstatements or misleading omissions, and that the financial statements and other financial information fairly presented Polestar's financial condition, results of operations, and cash flows in all material respects. Ingenlath and Ansgar both also certified their responsibility for Polestar's internal controls over financial reporting.

98.     Defendants Ingenlath and Ansgar also certified that the 20-F complied with all Exchange Act requirements and that the information contained in the report

26

fairly presented, in all material respects, Polestar's financial condition and results of operations.

99.    Defendants made the aforementioned certifications despite acknowledging that the Company's disclosure controls and procedures were not effective due to material weaknesses in internal control over financial reporting.

100.   On September 30, 2024, Polestar filed with the SEC a current report on Form 6-K that was signed by Defendants Ingenalth and Ansgar. This 6-K contained Polestar's financial information for the six-month periods ended June 30, 2023, and June 30, 2024.

101.   As the Restatement Announcement would later admit, the financial information included in this Form 6-K underreported accrued liabilities and assets, which understated the capital-intensive nature of Polestar's production process.

**6.     The Internal Control Weaknesses that Polestar was Aware of Cause Polestar to Restate its Financials**

102.   On January 16, 2025, before the market opened, Polestar announced the Restatement, stating:

> On January 14, 2025, the management of Polestar Automotive Holding UK PLC (the "Company"), in consultation with the Audit Committee of the Board of Directors (the "Audit Committee"), concluded that the Company's previously issued audited financial statements included within Annual Reports on Form 20-F for the years ended December 31, 2022 and December 31, 2023 (the "Audited Affected Financials") and the unaudited interim financial information included within Current Reports on Form 6-K for the quarterly periods ending on and falling between September 30, 2022 and June 30, 2024 (the "Unaudited Affected Financials" and together

27

with the Audited Affected Financials, the "Affected Financials") contain errors that warrant restatement of the Audited Affected Financials and the interim financial information for the six-month periods ended June 30, 2023, and June 30, 2024.

The primary reason for this restatement decision relates to balance sheet errors concerning the Company's unique tooling (further explained below), *which have resulted in an underreporting of assets and accrued liabilities in matching amounts for the periods referenced above*. The correction of these balance sheet errors will have no impact on previously reported revenue, operating loss, net loss, adjusted EBITDA or net assets, nor do these corrections affect the Company's underlying business operations, cash position, or liquidity.

As previously disclosed, the Company owns unique tooling which is used in the manufacturing of its vehicles. This unique tooling has previously been recognised as property plant and equipment once either the production standard part process test is conducted or production utilizing the unique vendor tools has occurred. *Management has determined that certain unique tooling should have instead been recognised as assets under construction ("AUC") according to the progression of work, resulting in a material understatement of AUC and a corresponding understatement of accrued liabilities in the Affected Financials*. The reconsideration of AUC recognition will change the timing of recognising AUC but will not change the expected total amount of AUC recognised.

A reclassification of cash flows between operating and investing activities and other smaller errors that have been identified will also be corrected as part of this restatement process.

*As a result of the above noted accounting errors, the Audit Committee, based on the recommendation of, and after consultation with, the Company's management, have further concluded that the Affected Financials should no longer be relied upon*, including the associated report of the Company's independent registered public accounting firm, Deloitte AB ("Deloitte"). Similarly, any quarterly results issued during the aforementioned periods, press releases, shareholder communications, investor presentations or other communications describing relevant portions of the Affected Financials should no longer be relied upon.

(Emphasis added).

103.    The January 16, 2025 Restatement Announcement was the materialization of the very internal-control risks that Polestar had known about for years.

104.    In particular, before the Restatement Announcement, Polestar disclosed material weaknesses in its internal controls, including deficiencies in its finance organization, technical-accounting review, financial-statement process and accrual controls. These weaknesses directly implicated Polestar's ability to identify and record its manufacturing obligations, including with respect to unique tooling assets and corresponding accrued liabilities.

105.    Polestar's Restatement Announcement admitted that its previously issued 2022 audited financial statements, which had already been restated just five months earlier, and 2023 audited financial statements and multiple interim financial statements, could no longer be relied upon because Polestar had failed to recognize certain unique tooling as assets under construction as work progressed and had correspondingly understated accrued liabilities. Accordingly, this Restatement was caused by the same deficient control environment Defendants had long known existed.

29

106. The Restatement was the predictable consequence of Defendants' decision to report financial results while disregarding the known deficiencies in the very systems needed to ensure that the results were accurate.

107. Further, at the same time Polestar issued the Restatement Announcement, the Company also lowered its earnings guidance for 2025. Specifically, the Company stated that:

> As a result of continued adverse market conditions, Polestar is today updating its guidance for 2024 and the fourth quarter. Prior expectations were for revenue in the year to be similar to that in 2023, and for a positive gross profit margin in the fourth quarter. For full year 2024 the Company now expects a mid-teens percentage decline in revenue and a negative gross margin around the same level as full year 2023, as the fourth quarter product mix was negatively impacted by fewer than expected Polestar 3 and Polestar 4 sales. Other one-time events also contributed to a difficult Q4, including a market value adjustment of inventory as well as continuing market pressure from discounting. A solid order intake for new models in late Q4 signals an encouraging start to 2025.

108. Polestar's ADS price crashed as the market digested Polestar's Restatement Announcement and its cut-back financial targets. These two pieces of information reinforced one another: Not only was Polestar's ramp up continuing to struggle but – considering that Polestar was admittedly cash-constrained and trying to fund a capital-intensive production ramp while minimizing cash burn – the Restatement Announcement provided further bad news because it showed that production was even more capital-intensive than Polestar had led investors to believe.

30

109. While Polestar repeatedly emphasized working-capital discipline, inventory management, and cash-flow improvement as central to its path to profitability, the Restatement Announcement undermined that narrative by revealing that Polestar had failed to record accrued liabilities for unique tooling as vendor work progressed. As a result, Polestar's balance sheet understated existing production-related obligations at the very time investors were focused on whether the Company could manage cash burn and fund the PS3/PS4 ramp.

110. One article noted that "Polestar digs in for another grim year":

The EV maker announced Thursday that it expects to generate less revenue in fiscal year 2024 than it did in 2023, after previously estimating sales would stay the same. That's thanks to "fewer than expected Polestar 3 and Polestar 4 sales," which was driven in part by a global EV price war.

Flagging sales have put pressure on Polestar from its lenders. One year ago, the automaker received a $950 million loan from a syndicate of banks. Polestar was supposed to generate more than $5.3 billion in revenue in 2024 as part of that loan agreement.

The company won't report its final 2024 financial figures for a few more months, but revenue is going to be well under 2023's figure of $2.4 billion, according to Thursday's guidance. (Polestar said investors should expect a "mid-teens percentage decline.") In turn, Polestar said it has worked with its parent company, Chinese conglomerate Geely Holdings, and the banks behind the loan, to amend that revenue target.

Polestar also announced Thursday that it has to re-do all of its financial statements dating back more than two years because of accounting errors related to the tooling it uses to build cars. The company said it underreported assets and liabilities related to that tooling along with "other smaller errors that have been identified will also be corrected as part of this restatement process."

31

> This all comes after Polestar went through layoffs and appointed a new CEO, CFO, and COO in 2024. Last year also saw the company lose the financial backing of Volvo.2

111.    Analysts at Barclays observed the fact that prior to the January 16, 2025 disclosures, Defendants provided only "a period of limited datapoints and a complete changeover of" management. The disclosures belatedly provided "a much needed source of clarity."

112.    Similarly, analysts at Bernstein lamented:

> Through its tangled web of interactions with associates and controlling parties, Polestar has had some difficulties to provide audited financial statements and has seen multiple restatements in recent quarters. While there is sufficient headline data to judge the overall shape of the business, we found modeling through the new set of assumptions and targets that we were missing regular disclosures to get more comfort on emission credits, capex, depreciation, etc… We hope that the upcoming financial disclosures will be less error-prone, rebuilding some confidence in the company's disclosures and a more precise understanding of its financial situation.

## 7.    <u>Additional Detail on Defendants' Admitted Accounting Errors</u>

113. As explained above, throughout the Class Period, Polestar acknowledged that its disclosure controls and procedures and internal controls over financial reporting ("ICFR") were not effective due to the existence of numerous material weaknesses.

---

2 https://techcrunch.com/2025/01/16/polestar-digs-in-for-another-grim-year/

114.   Failure to address deficiencies in ICFR – especially for an extended period, as here – signals tolerance for noncompliance and ineffective oversight. This undermines the tone at the top, which is fundamental to the functioning of any internal control system. These unremediated, material weaknesses manifested in the restatements of the Company's financial statements announced during the Class Period.

115.   The principal component of the Restatement announced on January 16, 2025, was a correction to the Company's accounting for unique tooling assets under construction ("AUC").

116.   The Company's previous accounting practice was not to record its AUC or the related liabilities on the balance sheet essentially until the assets were placed in service and production began. The Company restated its AUC accounting to reflect the acquired AUC and the related contractor liability incurred as the work on the AUC progressed. While the restatement for improper accounting of AUC did not have an impact on the Company's previously reported earnings, it consisted of recording the previously unrecognized AUC as part of property, plant and equipment and recording a corresponding offsetting liability (as part of current and non-current liabilities) on the balance sheet, thereby disclosing the capital-intensive nature of the production process for Polestar vehicles.

33

117. AUC is presented as "Machinery under development" in the notes to the financial statements. Since the Company had disclosed in the notes to the financial statements that there were additions to AUC, users of the financial statements would not have been aware that those additions were materially understated. The amounts of the additions to the Machinery under development during 2022 and 2023 were materially increased as part of the Restatement announced on January 16, 2025.

118. Polestar's accounting policy disclosures in the superseded financial statements specifically state that it records as part of the asset all costs of acquired property, plant, and equipment ("PP&E"), including purchase price and expenditures directly attributed to the acquisition and subsequent preparation of the assets for their intended use. As evidenced by the January 16, 2025 Restatement Announcement, however, this was not the case.

*a.     The Relevant Accounting Rule*

119. Polestar disclosed that its financial statements were prepared in conformity with the International Financial Reporting Standards ("IFRS"). IAS 16, *Property, Plant and Equipment*, establishes principles for recognizing property, plant and equipment ("PP&E") as assets, measuring their carrying amounts, and measuring the depreciation charges and related impairment losses.

34

120.   According to IAS 16, "[t]he cost of an item of property, plant and equipment shall be recognised as an asset if, and only if:

(a) it is probable that future economic benefits associated with the item will flow to the entity; and

(b) the cost of the item can be measured reliably." IAS 16 ¶ 7.

121.   According to According to IAS 16, "[a]n item of property, plant and equipment that qualifies for recognition as an asset shall be measured at its cost." IAS 16 ¶ 15. All PP&E costs are evaluated for recognition at the time they are incurred.  This includes initial costs to acquire or to construct an item of PP&E, and costs incurred subsequently to add to it, replace part of it, or to service it. IAS 16 ¶ 10.

122.   IFRS principles reflected in IAS 37, *Provisions, Contingent Liabilities and Contingent Assets*, apply when determining incurred cost and the related liability is recognized. IAS 16 ¶ 18.  IAS 37 states that a provision (a liability of uncertain timing or amount) is recognized when (a) an entity has a present obligation (legal or constructive) as a result of a past event; (b) it is probable that an outflow of resources embodying economic benefits will be required to settle the

obligation; and (c) a reliable estimate can be made of the amount of the obligation. IAS 37 ¶ 14.3

123.   Based on the above IFRS provisions, an item of PP&E is recognized progressively as work is performed to construct or acquire the asset and to bring the asset "to the location and condition necessary for it to be capable of operating in the manner intended by management", so long as it is probable that the item of PP&E will be deployed for an economic benefit (IAS 16 ¶ 7), the entity has a present legal or constructive obligation to pay for the work performed (IAS 37 ¶ 14), it is probable that obligation will be settled (IAS 37 ¶ 14), and the amount of the cost can be measured or estimated reliably (IAS 16 ¶ 7 and IAS 37 ¶ 14).

124.   As long as the above criteria are met, these costs are recognized on the balance sheet in the form of assets and liabilities in time periods before the asset is available for use (e.g., before production starts) and depreciation commences. "Depreciation of an asset begins when it is available for use, i.e., when it is in the location and condition necessary for it to be capable of operating in the manner intended by management." IAS 16 ¶ 55.

---

[3] By contrast, trade payables are liabilities recognized for goods and services that have been received and invoiced or formally agreed, and accruals are liabilities recognized for goods and services that have been received but not yet invoiced or formally agreed. IAS 37 ¶ 11.

b.      *Materiality of Accounting Errors in Financial Statements*

125.   Under IFRS, restatement to correct errors in previously issued financial statements is governed primarily by IAS 8. "Errors can arise in respect of the recognition, measurement, presentation or disclosure of elements of financial statements. Financial statements do not comply with IFRSs if they contain either material errors or immaterial errors made intentionally to achieve a particular presentation of an entity's financial position, financial performance or cash flows." IAS 8 ¶ 41.

126.   IAS 8 requires material prior-period errors to be corrected retrospectively in the first set of financial statements authorized after discovery, generally by restating comparative amounts and, if needed, opening balances of assets, liabilities, and equity for the earliest period presented. IAS 8 ¶ 42.

127.   SEC Staff Accounting Bulletin ("SAB") Topics 1.M and 1.N (generally referred to as SAB Nos. 99 and 108, respectively) offer the most comprehensive guidance on the determination of materiality of misstatements of financial statements. The bulletins bring together guidance from financial accounting standards, auditing standards, and decisions of the United States Supreme Court.

128.   SAB 99 addresses misstatements or omission of amounts, classifications, manner of presentation, and disclosures in financial statements. It

37

provides that the materiality assessment must be based on consideration of all relevant circumstances--the "total mix" of information, including the size of the misstatement and the context in which the user of the financial statements would view the item. It also sets forth the SEC Staff's view that there are circumstances in which misstatements below a percentage threshold (e.g., 5 percent) would be material.

129. According to SAB 99, a misstatement may be material if it:

- arises from an item capable of precise measurement or whether it arises from an estimate and, if so, the degree of imprecision inherent in the estimate

- masks a change in earnings or other trends

- hides a failure to meet analysts' consensus expectations for the enterprise

- changes a loss into income or vice versa

- concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or profitability

- affects the registrant's compliance with regulatory requirements

- affects the registrant's compliance with loan covenants or other contractual requirements

- has the effect of increasing management's compensation – for example, by satisfying requirements for the award of bonuses or other forms of incentive compensation

- involves concealment of an unlawful transaction.

130.   Pursuant to SAB 99, "[t]he shorthand in the accounting and auditing literature for this analysis is that financial management and the auditor must consider both 'quantitative' and 'qualitative' factors in assessing an item's materiality."

131.   In summary, the evaluation of whether a misstatement or omission in financial statements is material is viewed from the standpoint of a reasonable investor and the likelihood that a misstatement or omission would have significantly altered decisions of the investor, considering the circumstances, including both quantitative and qualitative factors, and the nature of the item and its location within the financial statements.

132.   Detailed restatement disclosures included in the April 23, 2025 Form 20-F/A revealed that, as a result of the Company's failure to record unique tooling under construction, its total assets, including PP&E, and total assets and liabilities were understated by $159.2 million and 76.4 million as of December 31, 2023 and 2022, respectively.

**8.**   **<u>Numerous Red Flags Demonstrate that Defendants' Accounting Errors Were Reckless at Best</u>**

　　*a.*   *The Direct Overlap Between the Control Weaknesses and the Restatement*

133. The close fit between Polestar's disclosed internal control weaknesses and the accounting error later revealed by the Restatement supports a strong inference of recklessness.

134. In the 2022 and 2023 20-F reports, Polestar disclosed deficiencies in the very processes needed to prevent the Restatement: financial-statement accounting review, accruals and accounts payable, review of complex and non-routine transactions, and the sufficiency of finance personnel with appropriate accounting and SEC-reporting expertise. The Restatement revealed that these are same processes that failed.

b.      *The 2021 Unique Tooling Agreement with Geely*

135. The terms of the December 23, 2021 Unique Vendor Tooling Agreement put Defendants on notice that Polestar was incurring tooling obligations as work progressed, well before any later production milestone.

136. That Agreement stated that production of the relevant Polestar vehicles required "Unique Vendor Tooling," for which Polestar would pay "as actual costs occur," that Geely would invoice Polestar each month for vendor payments incurred since the prior invoice date, and that those invoices would include detailed specifications identifying the tooling and costs charged. Those provisions made the work-progress/accrual accounting issue apparent: Polestar was receiving monthly information showing tooling costs incurred and obligations owed, yet it failed to

40

record corresponding assets under construction and accrued liabilities until a later production-standard-part process test or production use. Defendants' failure to account for this obvious mismatch was at least reckless.

### c.    The Earlier Restatement

137.    The earlier restatement – the one contained in the 2023 20-F – was another red flag because it demonstrated that Polestar's accounting-review process had already experienced related failures in earlier periods.

138.    More, the later Restatement announced in January 2025 arose from the same controls: Polestar failed to identify a multi-period accounting error involving capitalization, contract-dependent tooling assets, and accrued liabilities. The similarity between the prior error and the later Restatement made the unique-tooling error foreseeable and readily discoverable, had Defendants conducted even a cursory review.

### d.    The 2023 Tooling-Related Asset Transfer Agreement

139.    The December 8, 2023 Asset Transfer Agreement was yet another powerful red flag because it demonstrated that Polestar recognized pre-production tooling assets as balance-sheet assets before vehicle production began.

140.    Under that agreement, Polestar transferred to Geely legal title to unique tooling and equipment used in manufacturing the Polestar 3, while retaining a purchase option and booking the transaction as a financing arrangement rather than

41

a sale. Because Polestar concluded that the PS3 unique tooling and equipment would remain on its balance sheet despite legal title being transferred, Defendants knew or were reckless in disregarding that unique tooling constitutes a recognized asset before ordinary production use. That accounting treatment directly undermined Polestar's later-disclosed milestone-based approach of waiting until a production-standard-part process test or production using the tools occurred before recognizing unique tooling. The obvious inconsistency between these treatments made the later-revealed AUC/accrual error foreseeable and readily discoverable.

> e.    *Polestar's Evolving Disclosures*

141.   Polestar's own evolving disclosures show that Defendants were focused on the precise timing issue later revealed by the Restatement.

142.   In the June 29, 2022 shell-company Form 20-F, Polestar explained that certain "PS Unique Tools" used in the production of Polestar vehicles were specifically suited for Polestar vehicles, that Polestar had the right to direct their use, and that production occupied 100% of the assets' capacity; accordingly Polestar stated that the PS Unique Tools were recognized as ROU assets by the Group. In later annual reports, Polestar added the timing trigger that those PS Unique Tools were recognized as ROU assets "from the day production starts."

143.   The added language is significant because it shows Defendants were not oblivious to the accounting trigger for unique tooling. Rather, the added

language is probative of recklessness because it shows Polestar focused on the same recognition-timing question later revealed to have been answered incorrectly. At minimum, the evolving disclosure made the later error foreseeable.

### f.    Production Delays

144.    The slipping Polestar 3 production schedule was another red flag that should have alerted Defendants to the precise accounting error later revealed by the Restatement.

145.    Polestar's erroneous accounting treatment depended on late-stage production milestones. But Polestar 3 production did not proceed on schedule. Public reports in May 2023 stated that Polestar delayed the start of Polestar 3 production to the first quarter of 2024.

146.    These mounting delays should have made the accounting problem increasingly obvious to Defendants. As the Polestar 3 production and production-readiness milestones slipped from 2023 into 2024, vendor work on Polestar's unique tooling and Polestar's related obligations continued to accrue even though Polestar's milestone-based accounting trigger had not occurred. Each delay therefore widened the gap between the economic reality – the tooling work performed, costs incurred, and obligations accrued – and Polestar's balance sheet, which deferred recognition until a production-standard-part process test or production use.

g.    *The Scale, Scope and Centrality of the Error*

147.   Defendants' recklessness is further demonstrated by the magnitude and centrality of the accounting failure. The Restatement affected Polestar's audited 2022 and 2023 financial statements and unaudited interim financial statements spanning nearly two years. It involved unique tooling, a production-critical asset directly tied to Polestar's vehicle-manufacturing processes and launch schedule. The error understated both assets and accrued liabilities, meaning Polestar failed to record not only the tooling being constructed for its vehicles but also the corresponding obligations incurred as that work progressed. Such a multi-period failure in a core manufacturing-accounting domain is not an isolated error.

148.   At minimum, this was a foreseeable consequence of Defendants' decision to issue and certify financial statements despite known weaknesses in the processes responsible for producing them.

149.   But it gets worse. The accounting error the Restatement revealed is relevant to what Defendant Ansgar repeatedly told investors was key to the Company and what Defendant Ansgar was so focused on: Lean working capital.

150.   Polestar repeatedly focused investors on working-capital discipline, inventory management, cash conservation, and the need to fund its production ramp efficiently. Yet the accounting error later revealed by the Restatement concerned

44

accrued liabilities for unique tooling, which are current and long-term obligations that should have been recorded as vendor work progressed.

151. The effect of failing to record those accrued liabilities was to understate the current and long-term liabilities associated with its manufacturing ramp, making its working-capital position appear more favorable and controlled than it was.

152. Regardless of whether they misstated willfully, however, by their own admission, Defendants were specifically focused on maintaining lean working capital and were scrutinizing the very accounts affected by the Restatement, including accrued expenses, accounts payable, tooling obligations, and assets under construction. Defendants' failure to identify the error for years prior to the Restatement Announcement supports a strong inference of recklessness.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS

153. The false and misleading statements are the 2022, 2023 and 2024 financial statements and associated certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002.

154. The 2022 Annual Report contained the following financial statements:

Polestar Automotive Holding UK PLC
Consolidated Statement of Loss and Comprehensive Loss
(in thousands of U.S. dollars except per share data and unless otherwise stated)

| Consolidated Statement of Loss | | For the year ended December 31, | | |
|---|---|---|---|---|
| | Note | 2022 | 2021 | 2020 |
| Revenue | 4 | 2,461,896 | 1,337,181 | 610,245 |
| Cost of sales | 5 | (2,342,453) | (1,336,321) | (553,724) |
| **Gross profit** | | **119,443** | **860** | **56,521** |
| Selling, general and administrative expense | 5 | (864,598) | (714,724) | (314,926) |
| Research and development expense | 5 | (167,242) | (232,922) | (183,849) |
| Other operating income and expense | 8 | (1,565) | (48,053) | 1,766 |
| Listing expense | 16 | (372,318) | — | — |
| **Operating loss** | | **(1,286,280)** | **(994,839)** | **(440,488)** |
| Finance income | 9 | 8,552 | 32,970 | 3,199 |
| Finance expense | 9 | (108,435) | (45,249) | (34,034) |
| Fair value change - Earn-out rights | 16 | 902,068 | — | — |
| Fair value change - Class C Shares | 16 | 35,090 | — | — |
| **Loss before income taxes** | | **(449,005)** | **(1,007,118)** | **(471,323)** |
| Income tax expense | 11 | (16,784) | (336) | (13,535) |
| **Net loss** | | **(465,789)** | **(1,007,454)** | **(484,858)** |
| Net loss per share (in U.S. dollars) | 12 | | | |
| Basic and diluted | | (0.23) | (0.53) | (0.29) |

**Consolidated Statement of Comprehensive Loss**

| | | 2022 | 2021 | 2020 |
|---|---|---|---|---|
| **Net loss** | | **(465,789)** | **(1,007,454)** | **(484,858)** |
| Other comprehensive income (loss): | | | | |
| Items that may be subsequently reclassified to the Consolidated Statement of Loss: | | | | |
| Exchange rate differences from translation of foreign operations | | 4,519 | (33,149) | 30,266 |
| **Total other comprehensive income (loss)** | | **4,519** | **(33,149)** | **30,266** |
| **Total comprehensive loss** | | **(461,270)** | **(1,040,603)** | **(454,592)** |

46

Consolidated Statement of Financial Position
(in thousands of U.S. dollars unless otherwise stated)

| | Note | As of the year ended December 31, 2022 | As of the year ended December 31, 2021 |
|---|---|---|---|
| **Assets** | | | |
| Non-current assets | | | |
| Intangible assets and goodwill | 13 | 1,396,477 | 1,368,356 |
| Property, plant and equipment | 10, 14 | 258,048 | 208,193 |
| Vehicles under operating leases | 10 | 92,198 | 120,626 |
| Other non-current assets | 15 | 5,306 | 1,682 |
| Deferred tax asset | 11 | 7,755 | 3,850 |
| Other investments | 15 | 2,333 | — |
| **Total non-current assets** | | 1,762,117 | 1,702,707 |
| Current assets | | | |
| Cash and cash equivalents | 15 | 973,877 | 756,677 |
| Marketable securities | 15 | — | 1,258 |
| Trade receivables | 17 | 246,107 | 157,753 |
| Trade receivables - related parties | 17, 25 | 74,996 | 14,688 |
| Accrued income - related parties | 25 | 49,060 | 5,103 |
| Inventories | 18 | 658,559 | 545,743 |
| Current tax assets | | 7,184 | 5,562 |
| Assets held for sale | 26 | 63,224 | — |
| Other current assets | 19 | 107,327 | 120,202 |
| **Total current assets** | | 2,180,334 | 1,606,986 |
| **Total assets** | | 3,942,451 | 3,309,693 |
| **Equity** | | | |
| Share capital | | (21,165) | (1,865,909) |
| Other contributed capital | | (3,584,232) | (35,231) |
| Foreign currency translation reserve | | 12,265 | 16,784 |
| Accumulated deficit | | 3,726,775 | 1,761,860 |
| **Total equity** | 20 | 133,643 | (122,496) |
| **Liabilities** | | | |
| Non-current liabilities | | | |
| Non-current contract liabilities | 4 | (50,252) | (28,922) |
| Deferred tax liabilities | 11 | (476) | (509) |
| Other non-current provisions | 21 | (73,985) | (38,711) |
| Other non-current liabilities | 15 | (14,753) | (11,764) |
| Earn-out liability | 16 | (598,570) | — |
| Other non-current interest-bearing liabilities | 10, 15 | (85,556) | (66,575) |
| **Total non-current liabilities** | | (823,592) | (146,481) |
| Current liabilities | | | |
| Trade payables | 15 | (98,458) | (114,296) |
| Trade payables - related parties | 15, 25 | (957,497) | (1,427,678) |
| Accrued expenses - related parties | 25 | (164,902) | (315,756) |
| Advance payments from customers | 15 | (40,869) | (36,415) |
| Current provisions | 21 | (74,907) | (44,042) |
| Liabilities to credit institutions | 23 | (1,328,752) | (642,338) |
| Current tax liabilities | | (10,617) | (13,089) |
| Interest-bearing current liabilities | 10, 15 | (21,545) | (10,283) |
| Interest-bearing current liabilities - related parties | 25 | (16,690) | (13,789) |
| Current contract liabilities | 4 | (46,217) | (58,368) |
| Class C Shares liability | 16 | (28,000) | — |
| Other current liabilities | 22 | (393,790) | (364,662) |
| Other current liabilities - related parties | 25 | (70,258) | — |
| **Total current liabilities** | | (3,252,502) | (3,040,716) |
| **Total liabilities** | | (4,076,094) | (3,187,197) |
| **Total equity and liabilities** | | (3,942,451) | (3,309,693) |

Polestar Automotive Holding UK PLC
Consolidated Statement of Cash Flows
(in thousands of U.S. dollars unless otherwise stated)

| | | For the year ended December 31, | | |
|---|---|---|---|---|
| | Note | 2022 | 2021 | 2020 |
| **Cash flows from operating activities** | | | | |
| Net loss | | (465,789) | (1,007,454) | (484,858) |
| Adjustments to reconcile net loss to net cash flows: | | | | |
| Depreciation and amortization | | 158,392 | 239,164 | 216,077 |
| Warranties | | 84,992 | 63,114 | 58,651 |
| Inventory impairment | | 27,877 | 31,984 | 35,984 |
| Finance income | | (8,552) | (32,969) | (3,199) |
| Finance expense | | 108,435 | 45,249 | 34,034 |
| Fair value change - Earn-out rights | | (902,068) | — | — |
| Fair value change - Class C Shares | | (35,090) | — | — |
| Listing expense | | 372,318 | — | — |
| Income tax expense | | 16,784 | 336 | 13,535 |
| Losses on disposals of assets | | — | — | 16 |
| Other non-cash expense and income | | 18,997 | 11,560 | 14,048 |
| Change in operating assets and liabilities: | | | | |
| Inventories | | (226,638) | (290,442) | (428,067) |
| Contract liabilities | | 13,373 | 70,220 | 17,071 |
| Trade receivables, prepaid expenses and other assets | | (220,118) | 48,574 | (268,004) |
| Trade payables, accrued expenses and other liabilities | | 52,801 | 519,676 | 764,661 |
| Interest received | | 8,552 | 1,396 | 3,199 |
| Interest paid | | (68,130) | (12,564) | (30,198) |
| Taxes paid | | (19,559) | — | — |
| **Cash used for operating activities** | | (1,083,423) | (312,156) | (57,050) |
| **Cash flows from investing activities** | | | | |
| Additions to property, plant and equipment | 14, 24 | (32,269) | (24,701) | (49,599) |
| Additions to intangible assets | 13, 24 | (681,204) | (104,971) | (194,108) |
| Additions to other investments | | (2,500) | — | — |
| **Cash used for investing activities** | | (715,973) | (129,672) | (243,707) |
| **Cash flows from financing activities** | | | | |
| Change in restricted deposits | | — | 48,830 | 134,681 |
| Proceeds from short-term borrowings | | 2,149,799 | 698,882 | 569,087 |
| Principal repayments of short-term borrowings | | (1,426,935) | (411,950) | (780,167) |
| Principal repayments of lease liabilities | | (18,905) | (8,578) | (2,298) |
| Proceeds from the issuance of share capital and other contributed capital | | 1,417,973 | 582,388 | 438,340 |
| Transaction costs | | (38,903) | — | — |
| **Cash provided by financing activities** | | 2,083,029 | 909,572 | 359,643 |
| Effect of foreign exchange rate changes on cash and cash equivalents | | (66,433) | (27,491) | 21,340 |
| **Net increase (decrease) in cash and cash equivalents** | | 217,200 | 440,253 | 80,226 |
| **Cash and cash equivalents at the beginning of the period** | | 756,677 | 316,424 | 236,198 |
| **Cash and cash equivalents at the end of the period** | | 973,877 | 756,677 | 316,424 |

Polestar Automotive Holding UK PLC
Consolidated Statement of Changes in Equity
(in thousands of U.S. dollars unless otherwise stated)

| | Note | Share capital | Other contributed capital | Currency translation reserve | Accumulated deficit | Total |
|---|---|---|---|---|---|---|
| Balance as of January 1, 2020 | 20 | — | 879,232 | (13,901) | (274,169) | 591,162 |
| Net loss | | — | — | — | (484,858) | (484,858) |
| Other comprehensive income | | — | — | 30,266 | — | 30,266 |
| **Total comprehensive loss** | | — | — | 30,266 | (484,858) | (454,592) |
| Changes in the consolidated group | 3 | 880,412 | (879,232) | — | 4,621 | 5,801 |
| Issuance of new shares | | 438,340 | — | — | — | 438,340 |
| **Balance as of December 31, 2020** | | 1,318,752 | — | 16,365 | (754,406) | 580,711 |
| Net loss | | — | — | — | (1,007,454) | (1,007,454) |
| Other comprehensive loss | | — | — | (33,149) | — | (33,149) |
| **Total comprehensive loss** | | — | — | (33,149) | (1,007,454) | (1,040,603) |
| Issuance of Convertible Notes | | — | 35,231 | — | — | 35,231 |
| Issuance of new shares | | 547,157 | — | — | — | 547,157 |
| **Balance as of December 31, 2021** | | 1,865,909 | 35,231 | (16,784) | (1,761,860) | 122,496 |
| Net loss | | — | — | — | (465,789) | (465,789) |
| Other comprehensive income | | — | — | 4,519 | — | 4,519 |
| **Total comprehensive loss** | | — | — | 4,519 | (465,789) | (461,270) |
| Merger with Gores Guggenheim Inc. | 16 | | | | | |
| Changes in the consolidated group | | (1,846,472) | 1,846,472 | — | 1,512 | 1,512 |
| Issuance of Volvo Cars Preference Shares | | 589 | 588,237 | — | — | 588,826 |
| Issuance to Convertible Note holders | | 43 | (43) | — | — | — |
| Issuance to PIPE investors | | 265 | 249,735 | — | — | 250,000 |
| Issuance to GGI shareholders | | 822 | 521,285 | — | — | 522,107 |
| Listing expense | | — | 372,318 | — | — | 372,318 |
| Transaction costs | | — | (38,903) | — | — | (38,903) |
| Earn-out rights | | — | — | — | (1,500,638) | (1,500,638) |
| Equity-settled share-based payment | 7 | 9 | 9,900 | — | — | 9,909 |
| **Balance as of December 31, 2022** | | 21,165 | 3,584,232 | (12,265) | (3,726,775) | (133,643) |

48

155. The financial statements in the paragraph above were materially false and misleading at the time they were made because the Company underreported accrued liabilities and assets.

156. Attached to the 2022 Annual Report are certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Securities Exchange Act of 1934, as adopted pursuant to section 302 of the Sarbanes-Oxley Act of 2002 whereby Defendants Ingenlath and Malmqvist personally signed off on the accuracy of both the financial reports and the Company's internal controls.

157. On August 14, 2024, the Company filed with the SEC its Annual Report on Form 20-F for the year ended December 31, 2023 (the "2023 Annual Report"). Attached to the 2023 Annual Report were signed certifications pursuant SOX signed by Defendants Ingenlath and Ansgar attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

158. The 2023 Annual Report contained certain restated figures for 2022, but still contained materially false financial information because of, among other things, underreporting assets and accrued liabilities relating to the Company's unique tooling.

159. The 2023 Annual Report disclosed internal control weaknesses, but underreported the issue, considering that it did not disclose material issues with

49

accounting for the Company's unique tooling, which resulted in an underreporting of assets and accrued liabilities.

160. The 2023 Annual Report included the following financial statements:

Polestar Automotive Holding UK PLC
Consolidated Statement of Loss and Comprehensive Loss
(in thousands of U.S. dollars except per share data and unless otherwise stated)

| Consolidated Statement of Loss | Note | For the year ended December 31, | | |
|---|---|---|---|---|
| | | 2023 | 2022 (Restated)[1] | 2021 (Restated)[1] |
| Revenue | 4 | 2,378,562 | 2,444,105 | 1,346,347 |
| Cost of sales | 6 | (2,791,643) | (2,343,302) | (1,336,688) |
| **Gross (loss) profit** | | (413,081) | 100,803 | 9,659 |
| Selling, general and administrative expense | 6 | (949,683) | (838,367) | (685,049) |
| Research and development expense | 6 | (158,406) | (174,916) | (234,019) |
| Other operating income (expense), net | 9 | 41,204 | (305) | (50,716) |
| Listing expense | 18 | — | (372,318) | — |
| **Operating loss** | | (1,479,966) | (1,285,103) | (960,125) |
| Finance income | 11 | 69,454 | 8,552 | 32,970 |
| Finance expense | 11 | (213,321) | (108,402) | (45,218) |
| Fair value change - Earn-out rights | 18 | 443,168 | 902,068 | — |
| Fair value change - Class C Shares | 18 | 22,000 | 35,090 | — |
| Share of losses in associates | 10 | (43,304) | — | — |
| **Loss before income taxes** | | (1,201,969) | (447,795) | (972,373) |
| Income tax benefit (expense) | 13 | 7,138 | (29,660) | 3,075 |
| **Net loss** | | (1,194,831) | (477,455) | (969,298) |
| Net loss per share (in U.S. dollars) | 14 | | | |
| Class A - Basic and Diluted | | (0.57) | (0.24) | (0.51) |
| Class B - Basic and Diluted | | (0.57) | (0.24) | (0.51) |

| Consolidated Statement of Comprehensive Loss | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| **Net loss** | | (1,194,831) | (477,455) | (969,298) |
| Other comprehensive (loss) income: | | | | |
| Items that may be subsequently reclassified to the Consolidated Statement of Loss: | | | | |
| Exchange rate differences from translation of foreign operations | | (10,237) | 180 | (32,318) |
| **Total other comprehensive (loss) income** | | (10,237) | 180 | (32,318) |
| **Total comprehensive loss** | | (1,205,068) | (477,275) | (1,001,616) |

50

Consolidated Statement of Financial Position
(in thousands of U.S. dollars unless otherwise stated)

| | Note | As of the year ended December 31, | |
| --- | --- | --- | --- |
| | | 2023 | 2022 (Restated)[1] |
| **Assets** | | | |
| Non-current assets | | | |
| Intangible assets and goodwill | 15 | 1,412,729 | 1,394,282 |
| Property, plant and equipment | 12, 16 | 316,867 | 275,954 |
| Vehicles under operating leases | 12 | 67,931 | 97,186 |
| Other non-current assets | 17 | 7,212 | 5,306 |
| Deferred tax assets | 13 | 43,041 | 11,287 |
| Other investments | 17 | 2,414 | 2,333 |
| **Total non-current assets** | | 1,850,194 | 1,786,348 |
| Current assets | | | |
| Cash and cash equivalents | 17 | 768,927 | 973,877 |
| Trade receivables | 19 | 126,205 | 239,578 |
| Trade receivables - related parties | 19, 27 | 61,026 | 79,225 |
| Accrued income - related parties | 27 | 152,605 | 49,060 |
| Inventories | 20 | 939,359 | 630,154 |
| Current tax assets | | 9,270 | 7,184 |
| Assets held for sale | 28 | — | 56,001 |
| Other current assets | 21 | 204,142 | 112,983 |
| Other current assets - related parties | 27 | 9,576 | — |
| **Total current assets** | | 2,271,110 | 2,148,062 |
| **Total assets** | | 4,121,304 | 3,934,410 |
| **Equity** | | | |
| Share capital | | (21,168) | (21,165) |
| Other contributed capital | | (3,615,187) | (3,584,232) |
| Foreign currency translation reserve | | 26,010 | 15,773 |
| Accumulated deficit | | 4,872,644 | 3,677,813 |
| **Total equity** | 22 | 1,262,299 | 88,189 |
| **Liabilities** | | | |
| Non-current liabilities | | | |
| Non-current contract liabilities | 4 | (63,063) | (49,018) |
| Deferred tax liabilities | 13 | (3,335) | (12,470) |
| Other non-current provisions | 23 | (104,681) | (75,362) |
| Other non-current liabilities | 17 | (73,149) | (27,859) |
| Earn-out liability | 18 | (155,402) | (598,570) |
| Other non-current interest-bearing liabilities | 12, 17 | (54,439) | (31,326) |
| Other non-current interest-bearing liabilities - related parties | 27 | (1,409,244) | (43,643) |
| **Total non-current liabilities** | | (1,863,313) | (838,248) |
| Current liabilities | | | |
| Trade payables | 17 | (92,441) | (97,418) |
| Trade payables - related parties | 17, 27 | (275,704) | (935,161) |
| Accrued expenses - related parties | 27 | (450,000) | (157,426) |
| Advance payments from customers | 17 | (16,415) | (35,717) |
| Current provisions | 23 | (94,887) | (72,849) |
| Liabilities to credit institutions | 25 | (2,023,582) | (1,326,388) |
| Current tax liabilities | | (12,812) | (14,394) |
| Interest-bearing current liabilities | 12, 17 | (19,547) | (11,935) |
| Interest-bearing current liabilities - related parties | 27 | (68,332) | (26,618) |
| Current contract liabilities | 4 | (112,062) | (45,119) |
| Class C Shares liability | 18 | (6,000) | (28,000) |
| Other current liabilities | 24 | (347,902) | (364,264) |
| Other current liabilities - related parties | 27 | (606) | (69,062) |
| **Total current liabilities** | | (3,520,290) | (3,184,351) |

F-7

Table of Contents

| | | | |
| --- | --- | --- | --- |
| **Total liabilities** | | (5,383,603) | (4,022,599) |
| **Total equity and liabilities** | | (4,121,304) | (3,934,410) |

1 - Refer to Note 31 - Restatement of prior period financial statements for reconciliations between originally reported and as revised annual amounts

51

Polestar Automotive Holding UK PLC
Consolidated Statement of Cash Flows
(in thousands of U.S. dollars unless otherwise stated)

| | Note | For the year ended December 31, 2023 | 2022 (Restated)[1] | 2021 (Restated)[1] |
|---|---|---|---|---|
| **Cash flows from operating activities** | | | | |
| Net loss | | (1,194,831) | (477,455) | (969,298) |
| Adjustments to reconcile net loss to net cash flows: | | | | |
| Depreciation and amortization expense | 6 | 115,010 | 142,991 | 217,841 |
| Warranty provisions | 23 | 65,543 | 91,283 | 57,480 |
| Impairment of inventory | 6, 20 | 134,877 | 14,830 | 30,782 |
| Impairment of property, plant, and equipment, vehicles under operating leases, and intangible assets | 6, 12, 15, 16 | 351,241 | — | — |
| Finance income | 11 | (69,454) | (8,552) | (32,970) |
| Finance expense | 11 | 213,321 | 108,402 | 45,218 |
| Fair value change - Earn-out rights | 18 | (443,168) | (902,068) | — |
| Fair value change - Class C Shares | 18 | (22,000) | (35,090) | — |
| Listing expense | 18 | — | 372,318 | — |
| Income tax benefit (expense) | 13 | (7,138) | 29,660 | (3,075) |
| Share of losses in associates | 10 | 43,304 | — | — |
| Gain on sale of asset grouping | 28 | (16,334) | — | — |
| Loss on derecognition and disposal of property, plant, and equipment and intangible assets | 15, 16 | 10,892 | 11,036 | — |
| Litigation provisions | 23 | 35,676 | — | — |
| Other provisions | 23 | 19,890 | 23,367 | 11,560 |
| Unrealized exchange (loss) gain on trade payables | | 26,787 | (26,672) | 9,876 |
| Other non-cash expense and income | | (8,510) | 11,266 | — |
| Change in operating assets and liabilities: | | | | |
| Inventories | 20 | (358,392) | (186,393) | (283,776) |
| Contract liabilities | 4 | 77,424 | 21,629 | 59,074 |
| Trade receivables, prepaid expenses, and other assets | 21, 26 | (151,634) | (222,691) | 57,119 |
| Trade payables, accrued expenses, and other liabilities | 24, 26 | (459,002) | 21,981 | 496,782 |
| Interest received | | 32,280 | 8,552 | 1,396 |
| Interest paid | | (220,147) | (68,130) | (12,564) |
| Taxes paid | | (35,477) | (19,559) | — |
| **Cash used for operating activities** | | **(1,859,842)** | **(1,089,295)** | **(314,555)** |
| **Cash flows from investing activities** | | | | |
| Additions to property, plant, and equipment | 16, 26 | (137,400) | (32,269) | (24,701) |
| Additions to intangible assets | 15, 26 | (457,364) | (674,275) | (102,236) |
| Additions to other investments | | — | (2,500) | — |
| Proceeds from sale of property, plant, and equipment | 16 | 1,779 | — | — |
| Proceeds from sale of asset grouping | 28 | 153,586 | — | — |
| **Cash used for investing activities** | | **(439,399)** | **(709,044)** | **(126,937)** |
| **Cash flows from financing activities** | | | | |
| Change in restricted deposits | | (1,906) | — | 48,830 |
| Proceeds from short-term borrowings | 25, 26, 27 | 3,262,831 | 2,149,799 | 698,882 |
| Proceeds from long-term borrowings | 26, 27 | 1,381,738 | — | — |
| Proceeds from related party capital contribution | 22, 27 | 25,565 | — | — |
| Proceeds from issuance of share capital and other contributed capital | 18, 22 | — | 1,417,973 | 582,388 |
| Repayments of borrowings | 25, 26, 27 | (2,553,008) | (1,426,935) | (411,950) |
| Repayments of lease liabilities | 12, 26 | (21,916) | (19,448) | (8,913) |

161.    The financial statements in the paragraph above were materially false and misleading at the time they were made because the Company underreported accrued liabilities and assets.

162.    On September 30, 2024, Polestar filed with the SEC a current report on Form 6-K that was signed by Defendants Ingenalth and Ansgar. This 6-K

52

contained Polestar's financial information for the six-month periods ended June 30, 2023, and June 30, 2024.

163.    As the Restatement Announcement would later admit, the financial information included in this Form 6-K was materially false and misleading because it under reported accrued liabilities and assets.

164.    The statements contained in this section of the Complaint were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Polestar's financial statements during the Class Period were materially misstated (and accordingly obscured the capital-intensive nature of Polestar's production process and ramp); (2) Polestar understated its internal control weaknesses; and (3) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## ADDITIONAL SCIENTER ALLEGATIONS

165.    As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and

53

disseminated to the investing public in the name of the Company or in their own name during the Class Period were false and misleading when made.

166. Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

167. By virtue of their positions as executive officers of the Company, the scienter of the Individual Defendants can be imputed to Polestar.

168. Each of the Individual Defendants resigned and/or departed from the Company during the Class Period. Defendant Malmqvist departed from the Company on January 11, 2024. Just months later, Defendants Ingenlath and Ansgar resigned from the Company effective in October 2024.

169. These resignations and departures support the inference that the Individual Defendants knew or recklessly disregarded that the alleged false and misleading misstatements and omissions were, in fact, false and misleading.

## **LOSS CAUSATION**

170. As outlined above, on the news of Polestar's January 16, 2025 announcement disclosing the Restatement, the price of Class A Polestar ADSs declined by $0.135 per ADS, or 11%, on higher-than-average volume, to close at $1.0850 on January 16, 2025.

171.   Market analysts connected the drop in stock price both to Polestar's announced Restatement, which disclosed that the internal control failures that Polestar had long known about and failed to remediate had led to errors across multiple years of the Company's financial statements such that the financial statements  can no longer be relied upon, and also to Polestar's declining revenues and slashed 2024 guidance that Polestar released at the same time.

172.   For instance, Investing.com ran an article on the morning of January 16, 2025 entitled: "Polestar shares tumble as revenue declines, guidance cut" that mentions Polestar's disappointing results, its slashed guidance, and its "plans to restate financial results for 2022, 2023 and parts of 2024 due to balance sheet errors related to tooling assets."

173.   The Restatement Announcement exacerbated investor disappointment with Polestar's results and reduced outlook because it revealed that, not only was the Company's production ramp generating weaker-than-expected vehicle sales and margins, but it also required greater production-related capital commitments than Polestar had previously reported.

174.   Put simply, while Polestar's results disclosed a weaker ramp, its Restatement Announcement disclosed a more capital-intensive one, and also pointed to a company that – even years into its life as a public entity and despite

55

Defendants' repeated certifications – still could not produce the type of reliable financial reports that the law requires and on which investors can rely.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

175.  Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who (1) purchased or otherwise acquired the publicly traded securities of Polestar between June 24, 2022 and January 16, 2025, both dates inclusive (the "Class Period"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

176.  The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Polestar securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

177.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

56

178. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

179. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants acted knowingly or recklessly in issuing the false filings;

- whether the prices of Polestar securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein;

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

180.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

181.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Polestar securities met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

- As a public issuer, the Company filed public reports;

- the Company communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- the Company's securities were liquid and traded with moderate to heavy volume during the Class Period; and

58

- the Company was followed by a number of securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

182.   Based on the foregoing, the market for the Company securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the common units, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

183.   Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## COUNT I
### Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder
### Against All Defendants

184.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

185.   This Count is brought on behalf of investors who bought Polestar securities during the Class Period, and is asserted based upon Section 10(b) of the

59

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

186.   During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

187.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

60

188.   As a result of the foregoing, the market price of Polestar securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Polestar securities during the Class Period in purchasing Polestar securities at prices that were artificially inflated as a result of these Defendants' false and misleading statements.

189.   Had Plaintiffs and the other members of the Class been aware that the market price of Polestar securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased Company securities at the artificially inflated prices that they did, or at all.

190.   As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

191.   By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Polestar securities during the Class Period.

## COUNT II
### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

192.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.   During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's business practices.

194.   As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

195.   Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful

62

acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Polestar securities.

196.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Class, pray for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiffs and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiffs and other members of the Class such other and further relief as the Court may deem just and proper.

63

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: May 22, 2026                    Respectfully submitted,


/s/ Laurence M. Rosen
**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen
One Gateway Center, Suite 2600
Newark, NJ 07102
Tel: (973) 313-1887
Fax: (973) 833-0399
Email: lrosen@rosenlegal.com

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Malcolm T. Brown
Matthew M. Guiney
Rourke C. Donahue
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Email: Brown@whafh.com
Email: Guiney@whafh.com
Email: Donahue@whafh.com

*Co-Lead Counsel for Co-Lead Plaintiffs*

64